IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| | |
|---|---|
| Marcia R. Sickler Mineral Trust,<br><br>                 Plaintiff,<br><br>vs.<br><br>LoneTree Energy & Associates, LLC and Hess Corporation,<br><br>                 Defendants. | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND REQUIRING THE PARTIES TO SHOW CAUSE**<br><br>Case No. 4:12-cv-077 |

Before the court is a motion for summary judgment filed by defendants LoneTree Energy & Associates, LLC ("LoneTree") and Hess Corporation ("Hess"). For the reasons set forth below, the court denies the motion.

**I.   BACKGROUND**

This is an action by the Marcia R. Sickler Mineral Trust ("Sickler Trust" or "Trust") against LoneTree and Hess for recovery of a $404,757.60 bonus payment that the Trust alleges defendants were obligated to pay under the terms of an oil and gas lease agreement. The Sickler Trust owns mineral acres in Sections 14 and 23, Township 146 North, Range 97 West, Dunn County, North Dakota ("Subject Lands").

Two oil and gas leases covering the Sickler Trust's mineral interests in the Subject Lands are relevant in this case. One is an oil and gas lease between the Sickler Trust and Hess ("Hess Lease"). The second is an oil and gas lease between the Sickler Trust and Continental Resources, Inc. ("Continental Lease") that was executed prior to the Hess Lease.

1

In addition to the Subject Lands, the Continental Lease covered the Sickler Trust's mineral interests in Sections 13 and 24, Township 146 North, Range 97 West. The Continental Lease was effective for a four-year term beginning July 16, 2007, and contained a continuous drilling provision which provided that following the four-year primary term, the lease would remain in effect for "as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. . . . " The four-year primary term expired on July 16, 2011.

The habendum clause in the Continental Lease was limited by a "Pugh Clause," which provided that the lease would terminate at the end of the primary term as to all lands not within a "producing or spacing unit . . . on which is located a well producing or capable of producing oil and/or gas or on which lessee is engaged in drilling or reworking operations." The Pugh Clause itself, however, was limited by a "continuous operations" provision which provided that the lease would not terminate so long as drilling or reworking operations were being continuously prosecuted, meaning no more than one year shall elapse between the completion of one well and the beginning of operations of another well.

On August 1, 2011, Marcia Sickler, as trustee for the Sickler Trust, and Continental executed an "Extension of Oil and Gas Lease" extending the Continental Lease for ninety days from August 15, 2011. The extension increased the Sickler Trust's royalty under the Continental Lease from the one-sixth (16.67 percent) royalty provided for in the original lease to a three-sixteenths (18.75 percent) royalty "for any well commenced subsequent to the expiration of the original primary term and subsequent to the expiration of any additional time earned under the continuous drilling provision of this lease." On September 20, 2011, the Sickler Trust recorded in Dunn County an

"Affidavit of Non-Payment" stating that the Trust had not received payment for the extension of the Continental Lease, that the time for payment for the extension had elapsed, and that the Continental Lease had expired as of July 16, 2011.

It appears the discussion regarding a possible lease to Hess commenced in September 2011, when Marcia Sickler's son, Klint Sickler, contacted LoneTree, a broker for Hess, and proposed leasing the Sickler Trust's mineral interests in the Subject Lands to Hess. On September 30, 2011, a deal was consummated that resulted in the execution of the following instruments:

- A Letter Agreement dated September 30, 2011, signed by Marcia Sickler, as trustee for the Sickler Trust, and LoneTree ("Letter Agreement"), which provided that the Trust would receive a 20% royalty and a bonus of $1,500.00 per net mineral acre for 337.298 net mineral acres for a total bonus of $505,947.00. The bonus was payable by LoneTree in two installments with the first installment of 20% of the bonus ($101,189.40) due within five days of September 30, 2011, and the second installment of 80% of the bonus ($404,757.60) due by November 11, 2011.

- The Hess Lease dated September 30, 2011, signed by Marcia Sickler, as trustee for the Sickler Trust.

- A Memorandum of Oil and Gas lease dated September 30, 2011, signed by Marcia Sickler, as trustee for the Sickler Trust.

- Two Orders for Payment signed both by LoneTree and Marcia Sickler, as trustee for the Sickler Trust. The first Order for Payment required payment of the initial 20% bonus amount within five days of September 30, 2011. The second Order for Payment required payment of the remaining 80% of the bonus amount on November

11, 2011. As will be discussed in more detail later, both Orders for Payment contained a proviso stating the bonus was payable on approval of title.

The parties agree that LoneTree paid the first bonus installment to the Trust. Exactly when payment was made cannot be determined from the record, but the Trust does not contend that the payment was untimely.

On October 11, 2011, Diamond Resources Co., on behalf of Continental, recorded in Dunn County a "Notice of Continuing Validity of Oil and Gas Lease" stating that the Continental Lease remained in effect because: (1) the July 16, 2011, lease expiration date was extended to August 15, 2011, under the continuous drilling clause; (2) Marcia Sickler executed the 90-day lease extension effective August 15, 2011; and (3) Continental tendered timely payment for the lease extension.

Defendants did not make the second bonus payment on or before November 11, 2011, as provided for in the second Order for Payment. On November 14, 2011, LoneTree, on behalf of Hess, sent a letter to Marcia Sickler noting the filing of the Notice of Continuing Validity of the Continental Lease and stating that, as of November 14, 2011, Continental had constructed a pad for the drilling of the Edward1-23H Well in the SW¼SE¼ of Section 23 of the Subject Lands. The letter went on to state that it was being sent "to follow up previous verbal confirmation that Hess Corporation will need to hold the remaining balance of the lease payment until the title issue with Continental is resolved."

On March 9, 2012, Continental filed an affidavit of production stating that the Edward1-23H Well had been completed on or about February 9, 2012, for a valid spacing unit comprising Sections 14 and 23 of Township 146, Range 97 (*i.e.*, the "Subject Lands") and that the well was producing. The affidavit went on to list the leases Continental claimed were being held by this production,

4

which included the Continental Lease. It does not appear that the Trust has contested the continuing validity of the Continental Lease as to the Subject Lands.

On May 25, 2012, the Sickler Trust initiated this action for payment of the second bonus amount in state court in Dunn County, North Dakota. On June 15, 2012, defendants removed the action to this court.

## II.     GOVERNING LAW

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine dispute as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012); Fed. R. Civ. P. 56(a). A factual dispute is material if, under the substantive law governing the issue, the dispute might affect the outcome of the suit. Schilf, 687 F.3d at 948-49 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). North Dakota substantive law governs this federal diversity action. See, e.g., Paracelsus Healthcare Corp. v. Philips Med. Sys., Nederland, B.V., 384 F.3d 492, 495 (8th Cir. 2004).

## III.    DISCUSSION

### A.     Contentions of the parties

Defendants argue they were excused from having to make the second bonus payment when Continental asserted that its lease remained in force and began preparatory work for the drilling of a new well in Section 23 of the Subject Lands. In support of this argument, defendants point to the

5

"title approval" proviso in the second Order of Payment that they contend reserved the right to approve title prior to making the second bonus payment.[1]

The Sickler Trust, on the other hand, makes several arguments for why defendants are obligated to make the second bonus payment. Essentially, the Trust's arguments are as follows:

- The only title issue that Hess reserved according to the Trust is whether the Trust owned the entire 337.298 net mineral acres upon which the bonus amounts were calculated. Even then, according to the Trust, Hess was obligated to pay a bonus on the adjusted mineral acreage if it turned out that the Trust owned less, which defendants have not demonstrated to be the case. In support of this argument, the Trust points to: (1) specific language in the Letter Agreement and in the Orders for Payment that it claims limits the basis upon which defendants could disapprove title; (2) the fact the express warranty was struck from the Hess Lease; and (3) the lack of any mention of the Continental Lease in the lease transaction documents.

- In the alternative, the Trust argues that, even if defendants reserved the right to disapprove the title based on the Continental lease, the most commonsense reading of the lease transaction documents is that defendants had to do so within the five days allotted after the execution of the lease for making the first bonus payment. The Trust points to language in the Letter Agreement as well as the "title approval"

---

[1] The Orders for Payment also included a "lease approval" provision. Defendants have not relied upon this provision as grounds for not making the second payment, and, perhaps, for good reason. See Smith v. Arrington Oil & Gas, Inc., 664 F.3d 1208, 1215-16 (8th Cir. 2012). Also, defendants have not advanced any equitable grounds for nonpayment, such as rescission, which may necessarily require proving that Continental's lease was validly continued with respect to the Subject Lands. Hence, the focus will be upon the "title approval" provision and whether defendants can rely upon that provision as grounds for not making payment. The presence of the "lease approval" provision, however, may be relevant to the construction of other language in the lease transaction documents.

proviso in the first Order for Payment that it claims suggest that any disapproval of the title had to be made within that time frame and that, in any event, defendants must be deemed to have approved the title once the first bonus payment was made.

The disagreement of the parties over whether defendants were obligated to make the second bonus payment stems in part from the broader disagreement over what the deal was in terms of the Continental Lease. The Trust contends that defendants agreed to bear the risk that Continental's rights under its lease would continue and this is the reason for the lack of mention of the Continental Lease in the lease transaction documents and the striking of the express warranty in the lease. Defendants disagree. They contend the bonus payments were staggered and a "title approval" proviso included in the Orders for Payment in part because they were unwilling to assume the risk of Continental's lease rights being extended as to the Subject Lands.

### B. Consideration of the parties' arguments in light of the language of the lease transaction documents

The parties do not dispute that the lease transaction documents must be read and construed together. See, e.g., Nichols v. Goughnour, 2012 ND 178, ¶ 13, 820 N.W.2d 740 ("Instruments that have been executed at the same time, by the same parties, in the course of the same transaction, and concerning the same subject matter, may be read and construed together."). They also do not dispute that ordinary contract interpretation principles apply to the construction of the lease transaction documents. See, e.g., Irish Oil and Gas, Inc. v. Riemer, 2011 ND 22, ¶ 11, 794 N.W.2d 715 (general rules governing the interpretation of contractual agreements apply to oil and gas leases) ("Irish Oil").

After careful review, the court concludes there is language in the lease transaction documents that supports the arguments of both parties with respect to what the essence of the deal was as to the Continental Lease and, more particularly here, whether defendants were obligated to

7

make the second bonus payment.   To explain why requires consideration of the language used in the  principal lease transaction documents.

## 1.     **The Letter Agreement**

The following is the text of the Letter Agreement  that was signed by both LoneTree  and the Sickler Trust:

> September 30, 2011
>
> Marcia R. Sickler
> 10190 22nd Street NW
> Gladstone ND 58630
>
> RE:     TOWNSHIP 146 NORTH, RANGE 97 WEST, 5th P.M.
>             Section 14:  All
>             Section 23:  All
>
>             Containing 1,280.00 acres more or less, in Dunn County, North Dakota - Net acres: 337.298
>
> Dear Ms. Sickler,
>
> Enclosed you will find an Oil and Gas Lease and Memorandum of Oil and Gas Lease covering the above captioned lands, two Orders of Payment, and one copy of each (so marked for your records).  The Orders for Payment are documents stating that the Marcia R. Sickler Mineral Trust will be paid by check.  Also enclosed is a W-9 form.
>
> *The first check will be paid 5 days from the date of this lease.  This will allow us time to process the lease and complete the necessary title work prior to paying the Lease bonus.  If, after confirmation of title, it is determined that the net acres owned by your Trust and available for leasing is different from 337.298, then the total bonus to be paid may be adjusted accordingly.*  Please note that the terms offered are as follows:
>
> - $1,500.00 per net mineral acre
> - 3 year lease term, paid up
> - 20.00% royalty
> - The bonus is payable in two installments of 20% (paid 5 days from the date of this lease) and 80% (paid on November 11, 2011)
>
> Please take some time to review the package.  If you have any questions or concerns, please contact me at the number below.  To execute this lease package you need to do the following:
>
>    1.    Sign the original lease and memorandum in the presence of a notary public.

2.      Fill in the Tax ID number or Social Security number for you [sic] Trust on
                        the enclosed W-9 form.
                3.      Return the original Oil and Gas Lease, Memorandum of Oil and Gas Lease,
                        Orders of Payment and the completed W-9 to us via the enclosed return
                        envelope.
                4.      Counter sign this letter below to acknowledge and acceptance of the terms
                        stated above and include in the enclosed return envelope.

   This offer expires 30 days from the above date, and return of the executed oil and gas lease
   after that date will be considered an offer by you to lease which the Lessee (or Lone Tree)
   can either accept or reject.

   Sincerely,                                              Marcia R. Sickler Mineral Trust
   [/s]                                                    [/s]
   Cliff Wehrman                                           Marcia R. Sickler, Trustee
   Agent for LoneTree Energy & Associates LLC
   Cell phone # 1-701-570-0006

(Doc. No. 17-1) (italics added).

The Trust argues that the most reasonable interpretation of the italicized language is that the only title issue reserved by defendants was whether the Trust owned all of the net mineral acres upon which the total bonus was calculated and that they assumed the risk with respect to the continuation of the Continental Lease. The Trust argues this become even more clear when the language of the Orders for Payment is considered.

Defendants disagree with this construction. A discussion of the reasons why as well whether there is any ambiguity with respect to this point will be deferred until after the language of the Hess Lease and the Orders for Payment can considered.

The Trust also argues that, even if defendants reserved the right to disapprove the title based on the Continental Lease, the italicized language in the Letter Agreement makes clear that they had to do so within the five days required for payment of the first bonus amount. Here, the Trust's interpretation is certainly a plausible one, particularly given the use of the word "this" to begin the second sentence. However, it is not the only plausible interpretation, particularly given the language

9

of the remainder of the lease transaction documents and the overall manner in which the transaction was structured.

Another plausible construction is that the word "this" referred not to the payment of the first bonus, but rather to the staggering of the bonus payments, *i.e.*, the upfront payment of 20% of the bonus within five days and payment of the remainder some forty-three days later, and that "this" would allow defendants sufficient time to investigate the Trust's title prior to having to make the final and larger bonus payment. In fact, the reason for the five days for the initial payment may have been that this was the amount of time LoneTree needed to fund the initial payment and/or receive Hess's approval of the lease, subject to ultimate approval of title, and that neither party contemplated that title would or even could be confirmed within that time frame.

### 2. **The Hess lease**

The "leasing clause" of the Hess Lease states in relevant part that the Sickler Trust:

> has granted, demised, leased and let by these presents, and by these presents does grant, demise, lease and let **exclusively** unto said Lessee, the land hereinafter described, with the **exclusive right** for the purposes of [developing the Subject Lands including for oil and gas purposes] * * * *

(Doc. No. 17-1). The "leasing clause" then goes on to describe the Subject Lands being leased as all of Sections 14 and 23 of Township 148 North, Range 97 West, "containing 1,280 gross acres, more or less."

Notably, while there is language in the other documents which states that the number of net mineral acres possessed by the Sickler Trust was presumed to be 337.298 acres, there is nothing in the "leasing clause" stating that the interest being leased was limited to either that number of mineral acres or only those mineral acres that the Trust actually had a right, title, or interest in. Before

10

discussing the possible significance of this, it is helpful to consider the "warranty clause" that appears later in the lease and reads as follows:

> 14. Lessor hereby ~~warrants and agrees to defend the title to the lands herein described, and~~ agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment any mortgages, taxes or other liens on the above described lands, in the event of default of payment by Lessor and be subrogated to the rights of the holder thereof, and the undersigned Lessors, for themselves and their heirs, successors and assigns, hereby surrender and release all right of dower and homestead in the premises described herein, insofar as said right of dower and homestead may in any way affect the purpose for which this lease is made, as recited herein.

(Doc. No. 17-1).

The Trust argues that defendants, by agreeing to the removal of the express warranty of title, necessarily agreed they were taking the risk with respect to the Continental Lease. Consequently, defendants did not have the right to disapprove title based on the Continental Lease and this is consistent with the other language of the lease transaction documents that the Trust contends makes clear that Hess reserved only the question of whether the Trust owned the number of net mineral acres that were the basis for the bonus calculation.

While the striking of the express warranty may be some evidence of what the parties intended with respect to the Continental Lease, the court has trouble understanding why that alone would be dispositive since the Trust may have had other reasons for wanting to eliminate the express warranty. One may have been a belief that this would eliminate any later claim for breach of the lease based upon the fact that the "leasing clause" purports to lease a greater interest than the 337.298 net mineral acres that the Trust appears to own in the Subject Lands.[2] Another may have been the

---

[2] The Trust argues that the striking of the express warranty eliminated any warranty from the lease. While that may very well have been the intention of the parties and the net result here, the striking of an express warranty is not the same thing as disclaiming any warranties that may be implied by law, particularly when there may be a concern that the express warranty may be broader. Also, the striking of an express warranty may not be enough to turn an oil and gas

11

unwillingness of the Trust to warrant the title of remote grantors. Still another may have been a concern, if the Trust had mortgaged the property, that a court might construe the language of the express warranty to include a covenant against encumbrances. Cf. Tank v. Burlington Resources Oil and Gas Co., LP, No. 4:10–CV–088, 2013 WL 3766526, **13-14 & n.8, 2013 U.S. Dist. LEXIS 99204 (D.N.D. July 16, 2013).

In short, there could be a number of reasons why the Trust would be unwilling to give an express warranty aside from the existence of the Continental Lease.[3] And, because there are other reasons why a mineral owner may not want to give an express warranty of title in this situation, it cannot be assumed that defendants took the Trust's request to strike the warranty as the equivalent of the Trust stating that it was only willing to convey what would amount to a "quitclaim" of whatever interest it possessed and that defendants would have to assume the risk of the Continental Lease continuing, particularly in light of the language of the "leasing clause," which, as noted earlier, suggests the contrary. Cf. Chesapeake Exploration, L.L.C. v. Valence Operating Co., No. H-07-2565, 2008 WL 4240486, **8-9, 2008 U.S. Dist. LEXIS 70349 (S.D. Tex. Sept. 10, 2008); 3-6 Williams & Meyers, Oil and Gas Law § 665 (LexisNexis, current through Dec. 2012).

---

lease into what essentially is a "quitclaim" conveyance as will be discussed further above.

As to whether there are any warranties implied by law for an oil and gas lease appears to be open question in North Dakota and may depend upon what language is used in the "leasing" or "conveyancing" clause. In particular, it does not appear that the North Dakota Supreme Court has addressed whether one or both of N.D.C.C. § 47-10-19 (covenants implied from the use of the word "grant") & N.D.C.C. § 47-16-08 (an agreement to lease real property contains an implied covenant of quiet possession) apply to oil and gas leases. See Tank v. Burlington Resources Oil and Gas, Co., L.P., No. 4:10–cv–088, 2011 WL 2600458,**4-10, 2011 U.S. Dist. Lexis 70238 (D.N.D. June 28, 2011); but cf. Irish Oil, 2011 ND 22, ¶15 (oil and gas leases should not be governed by the law or policy applicable to ordinary landlord tenant leases unless a contrary intention appears).

[3] In fact, from a mineral owner's perspective, there would seem to be little reason to ever give a general warranty of title - at least not in a "hot" market when the landowner has some bargaining power. In other words, from the mineral owner's perspective, the lessee can undertake its own investigation of title and bear the risk of any mistake.

Likewise, it does not necessarily follow that because defendants agreed to the deletion of the express warranty they necessarily agreed to assume the risk with respect to the Continental Lease, even if they viewed the lease as a mere "quitclaim" of the Trust's working interest. This is because there is a difference between having a warranty (either express or implied) upon which a person can sue if title turns out to be defective and having a contractual "out" not to complete a transaction based on a party not owning what they are attempting to convey, which is what defendants argue is the reason for the "title approval" provision in the Orders for Payment. Defendants may simply have been satisfied with the latter.

Also, what may be relevant in sorting out what the parties agreed to in this case is what the Hess Lease did not contain. The Trust argues that absence of any mention of the Continental Lease in the lease transaction documents is indicative of defendants having assumed the risk of the continuation of the Continental Lease with respect to the Subject Lands. While that may be, there is also the fact that the grant of the exclusive right to develop the Subject Lands for oil and gas purposes in the "leasing clause" was not made subject to the rights of Continental under the Continental Lease. This is language the Trust could have requested be inserted if it was going to insist that defendants bear the risk of Continental's rights continuing. Finally, there is no language in the Hess Lease that suggests it was intended merely to be a "top lease" to the Continental Lease. Cf. Nantt v. Puckett Energy Co., 382 N.W.2d 655, 657 n.1 (N.D. 1986) (referencing a top lease as a lease granted during the existence of a prior mineral lease which is to become effective if when the existing lease expires or is terminated).

    **3.**    **The Orders for Payment**

The two Orders for Payment that were provided to the Sickler Trust at the time of execution of the lease are virtually identical, except for the amounts, the deadlines for payment, and the recitation of the percentage that each Order bore to the entire amount of the bonus payable. The text of the Orders for Payment is set forth below with the bracketed language reflecting the changes from the first to the second Order for Payment:

ORDER FOR PAYMENT

*On approval of the agreement associated herewith and on approval of title to the same, LoneTree Energy & Associates LLC will make payment as indicated herein by check within 5 days of September 30, 2011 [November 11, 2011].* Payment is deemed complete upon mailing or dispatch. No default shall be declared for failure to make payment until 10 days after receipt of written notice from payee of intention to declare such default.

If the Oil and Gas Lease referenced herein covers less than the entire undivided interest in the oil and gas or other rights in such land, then the dollar amount listed herein shall be paid to the Lessor only in the proportion which the interest in said lands covered by the Agreement bears to the entire undivided interest therein. Further, should Lessor own more or less than the net interest defined herein, Lessee shall increase or reduce the dollar amount payable hereunder proportionately.

Lessor and Lessee agree that, when Lessor executed the Oil and Gas Lease, Lessor and Lessee entered into a binding contract that, among other things, leases the lands listed in the Oil and Gas Lease and/or Exhibit A to Lessee. *Lessee agrees to pay Lessor the bonus consideration for the Lease subject to Lessee verifying Lessor's net mineral acre ownership, as determined solely by Lessee.*

PAY TO:      Marcia R. Sickler Mineral Trust

AMOUNT:    * * * *                                $101,189.40 [$404,757.60]

ADDRESS:   10190 22nd Street SW, Gladstone ND 58630

This payment constitutes 20% [80%] bonus consideration for a 3 year PAID-UP Oil and Gas Lease dated September 30, 2011 covering the following described lands in Dunn County, North Dakota.

   TOWNSHIP 146 NORTH, RANGE 97 WEST, 5th P.M.
   Section 14: All
   Section 23: All
   GROSS ACRES: 1,280
   NET ACRES: 337.298

14

| LoneTree Energy & Associates, LLC | Marcia R. Sickler Mineral Trust |
| [/s] | [/s] |
| Aaron Michael, as Agent | Marcia R. Sickler, Trustee |

(Doc. No. 17-1) (italics added).

The Sickler Trust argues that the language of the Orders for Payment reinforces its construction of the Letter Agreement as to what the essence of the deal was. In particular, with respect to its argument that defendants reserved only the question of whether the Trust owned the assumed number of mineral acres and took the risk with respect to the Continental Lease, the Trust points to the second sentence set forth in italics above. The Trust argues that this language, which affirmatively states that the bonus will be paid subject to the verification of the net mineral acres, is unqualified and defines what question of title remained to be resolved.

The court agrees that the Trust's proffered construction is certainly a plausible one. However, it is not the only possible interpretation. The language in question could simply have been intended as a restatement of the obligation to pay the bonus with the added qualification that Hess's determination of the number of net mineral acres owned would prevail (which is the first time that point is mentioned), but that the obligation to pay was still subject to the overall "title approval" proviso in the first sentence of the Orders for Payment. Also, the reference to "Lessor's net mineral acre ownership" could have been intended to mean ownership of the full rights to the net mineral acres, *i.e.*, not only the right to lease and reserve a royalty, but also the "working interest," so that no bonus would be owed if the adjusted number of *unencumbered* net mineral acres owned by the Trust was zero. Arguably, this construction would also be consistent with the "leasing clause" of the Hess Lease, whereby the Trust granted to Hess the "exclusive right" to develop the Subject Lands for the entire three-year term of the Hess Lease.

15

The Trust also argues that the language of the Orders for Payment is consistent with the language of the Letter Agreement that the Trust contends required that any disapproval of title had to be made within the five days allowed for making the first bonus payment and that, in any event, the making of the first bonus payment necessarily assumes approval of title. In response, defendants contend that, if this had been the intention of the parties, there would have been no reason for two bonus payments, much less inclusion of the "title approval" proviso in the second Order for Payment.

The construction advanced by the Trust is plausible, even with the staggering of the bonus payments and the inclusion of the "title approval" language in the second Order of Payment. One plausible reading of the Orders of Payment, particularly when construed with what was stated in the Letter Agreement as discussed earlier, is that any disapproval of title had to be made within the five days prior to making the first payment and that once title was approved concomitant with the payment of the first bonus amount, title was approved and no longer an issue with respect to the second Order for Payment. Further, from the Trust's perspective, the request for the staggering of the bonus payments might simply have been viewed as defendants wanting additional time to gather the cash required for payment of the full bonus amount.

On the other hand, construing the lease transaction documents together, another very plausible construction is one noted earlier: The bonus payments were staggered to give defendants time after the initial upfront payment of 20% of the bonus to undertake a title investigation prior to having to pay the final and larger bonus amount. The inclusion of the "title approval" proviso in the first Order for Payment may simply have been the result of the same form being used and was not intended to alter the ability to disapprove title later based on the "title approval" proviso in the

16

second Order for Payment. Also, another possibility is that the "title approval" language was placed in the first Order for Payment to make clear that Hess would have the opportunity (but not the obligation) to disapprove title prior to having to make the first bonus payment. Still another possibility is that the "title approval" language was included in both Orders for Payment to give defendants two opportunities to disapprove the title.

### C. Defendants not entitled to summary judgment

"A contract is ambiguous when rational arguments can be made for different interpretations." Golden v. SM Energy Co., 2013 ND 17, ¶ 13, 826 N.W.2d 610. Here, the court concludes that the lease transaction documents in question are ambiguous with respect to what the deal was in terms of the Continental Lease and, more importantly, whether defendants were obligated to make the second bonus payment in light of the circumstances that developed following the execution of the lease transaction documents.

When a contract is ambiguous, the court can consider relevant extrinsic evidence in ascertaining the mutual intent of the parties. Id. at ¶ 19. And here, while both parties have referenced some extrinsic evidence in making their arguments, it is not clear they are in complete agreement with respect to that evidence and they most certainly are not in agreement with respect to the inferences to be drawn from the evidence. Further, there may be other relevant extrinsic

17

evidence that the parties have not submitted.[4] In short, it appears a trial will be required if the problem noted in the next section is resolved.[5]

### D. Whether the Sickler Trust is the "real party in interest"

Defendants in their answer assert that the Sickler Trust is not the real party in interest, but did not address this defense in their present motion for summary judgment. If defendants have not waived this defense, the court does not want to expend more time on this case until this issue is resolved.

In diversity cases, the court must look to state law to determine whether a party has the capacity to sue. E.g., Kuelbs v. Hill, 615 F.3d 1037, 1041 (8th Cir. 2010). And, at least as of 1995, the North Dakota Supreme Court has concluded that a suit cannot be brought in the name of a trust but rather must be brought by the trustee. Western Life Trust v. State, 536 N.W.2d 709, 712 (N.D. 1995) (dismissal of an appeal brought in the name of a trust because the trust lacked capacity to sue under North Dakota law and was not a proper party).

---

[4] It was represented during argument that there were discussions between the parties with respect to the proposed transaction. If so, evidence of what was communicated between the parties may be relevant in ascertaining the mutual intentions of the parties, which is the primary goal under North Dakota law when interpreting a contract. See, e.g., Bendish v. Castillo, 2012 ND 30, ¶ 16, 812 N.W.2d 398; National Bank of Harvey v. International Harvester Co., 421 N.W.2d 799, 804 (N.D. 1988) ("It is the outward manifestations of assent which govern, not the secret intentions of the parties."); N.D.C.C. § 9-07-03. What may also be relevant in terms of what the deal was is the size of the bonus and whether it was larger than what might have been paid for a top lease, for example, and the subsequent conduct of the parties. Finally, there may be evidence relevant to the court's consideration of the statutory rules of construction set forth in N.D.C.C. ch. 9-07, such as the extent of the negotiation between the parties and whether either party was represented by counsel.

[5] If the parties believe there is no other relevant evidence to be provided and do not want the court trial, the parties can either stipulate that the court can resolve the case based on the existing record, including the court being able make credibility determinations with respect to the affidavits that have been submitted, or the parties can stipulate to the facts and exhibits.

## IV. ORDER

Based on the foregoing, it is hereby **ORDERED** as follows:

1. Defendants' motion for summary judgment is denied; and

2. The parties shall have 20 days from the date of this order to show cause why this case should not be dismissed without prejudice based on the fact that the Sickler Trust is not the real party in interest and lacks capacity to bring this action.

Dated as of this 23rd day of August 2013.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr., Magistrate Judge
United States District Court