**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Marcia R. Sickler as Trustee of the Marcia R. Sickler Mineral Trust | ) ) ) | **FINDINGS OF FACT,** |
| Plaintiff, | ) ) | **CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| vs. | ) ) | |
| LoneTree Energy & Associates, LLC and Hess Corporation, | ) ) ) | Case No. 4:12-cv-077 |
| Defendants. | ) | |

## I. INTRODUCTION

This is an action by Marcia R. Sickler in her capacity as trustee of the Marcia R. Sickler Mineral Trust ("Sickler Trust" or "Trust"). Marcia Sickler is suing on behalf of the Trust to recover from defendants LoneTree Energy & Associates, LLC ("LoneTree") and Hess Corporation a $404,757.60 bonus payment the Trust alleges defendants were obligated to pay under the terms of an oil and gas lease agreement. The court denied defendants' motion for summary judgment on August 23, 2013, concluding that the agreement was ambiguous. Marcia R. Sickler Mineral Trust v. LoneTree Energy & Associates, LLC, No. 4:12–cv–077, 2013 WL 4508429, 2013 U.S. Dist. LEXIS 120079 (D.N.D. Aug. 23, 2013) ("Marcia R. Sickler Mineral Trust").

The court conducted a half-day bench trial on December 10, 2013. What follows are the court's Findings of Fact, Conclusions of Law, and Order for Judgment.

1

## II. FINDINGS OF FACT[1]

1.0 The Sickler Trust owns mineral acres in several different sections of land including Sections 14 and 23, Township 146 North, Range 97 West, Dunn County, North Dakota ("Subject Lands"). Marcia R. Sickler is the trustee of the Sickler Trust.

2.0 Two oil and gas leases covering the Trust's mineral interests in the Subject Lands are relevant in this case. One is an oil and gas lease between the Sickler Trust and Hess dated September 30, 2011, ("Hess Lease") covering just the Subject Lands. The second is an earlier oil and gas lease between the Trust and Continental Resources, Inc. dated July 16, 2007 ("Continental Lease") that covers the Trust's mineral interests in the Subject Lands as well as Sections 13 and 24, Township 146 North, Range 97 West.

3.0 The Continental Lease was effective for a four-year term beginning on July 16, 2007. Among other things, the Continental Lease included:

- A "continuous drilling" provision, which provided that following the four-year primary term, the lease would remain in effect for "as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. . . ."
- A "Pugh Clause," which provided that the lease would terminate at the end of the primary term as to all lands not within a "producing or spacing unit . . . on which is located a well producing or capable of producing oil and/or gas or on which lessee is engaged in drilling or reworking operations."

---

[1] These are the court's principal findings of fact as required by Fed. R. Civ. P. 52(a)(1). Additional findings of fact may appear in the court's conclusions of law, particularly when ruling on mixed questions of law and fact.

- A "continuous operations" provision, which provided that the lease would not terminate so long as drilling or reworking operations were being continuously prosecuted, meaning no more than one year shall elapse between the completion of one well and the beginning of operations of another well.

4.0     On August 1, 2011, Marcia Sickler, as trustee for the Sickler Trust, and Continental executed an "Extension of Oil and Gas Lease" that: (a) referenced the Continental Lease and described it as covering Sections 14 and 23, Township 146 North, Range 97 West; (b) stated in the recitals that the lease expired on August 15, 2011, in the absence of drilling operations, and that the desire of the parties was to extend the primary terms of the lease; (c) extended the term of the lease for a period of ninety days from August 15, 2011; and (d) increased the royalty from the one-sixth (16.67 percent) to a three-sixteenths (18.75 percent) "for any well commenced subsequent to the expiration of the original primary term and subsequent to the expiration of any additional time earned under the continuous drilling provision of this lease."

5.0     In late August or early September 2011, Marcia Sickler and her husband Galen began questioning whether the Continental Lease was validly extended because the Trust had not yet received payment from Continental for the extension. They got their son, Klint Sickler, involved and it was decided that Klint would approach Hess, with whom they had other leases, to see if Hess might be interested in leasing the Subject Lands. Klint contacted Hess and Hess directed him to its leasing agent LoneTree, which, in turn, directed one its of land persons, Cliff Wehrman, to work with the Sicklers.

6.0     Marcia Sickler and her trust had been involved several prior lease transactions. While Klint Sickler did not have any interest in his mother's trust, he would at times act in an

advisory capacity since he had prior experience in oil and gas leasing matters and had his own interest in a separate children's trust. Also, it was clear from Klint Sickler's testimony and other record evidence that he was knowledgeable about oil and gas leases specifically and business matters generally. Sickler had graduated from college with a double major in business and communications and from there had gone on to obtain master's degrees in business and IT management.

7.0	Soon after Klint Sickler approached Hess, Wehrman made contact with him. Sickler advised Wehrman of the situation with respect to the Continental Lease, including the Trust's position that the lease may have expired for nonpayment for the extension. Sickler emailed Wehrman copies of the Continental Lease and the lease extension.

8.0	Wehrman, in turn, passed the information on to his superior at LoneTree and the information found its way to Michael Allen, a land manager for Hess in Texas, for a decision as to whether to offer anything to the Sickler Trust for a lease.

9.0	On September 20, 2011, the Trust recorded in Dunn County an "Affidavit of Non-Payment" stating that the Trust had not received payment for the extension of the Continental Lease, that the time for payment for the extension had lapsed, and that the Continental Lease had expired as of July 16, 2011. The fact that the Sickler Trust made this filing confirming what it had earlier advised Hess was made known to land manager Allen.

10.0	In addition to relying upon the information provided by the Sicklers, land manager Allen had a surface inspection made of the Subject Lands to confirm that Continental had not engaged in any onsite activity. This site inspection was performed because one of Hess's concerns was that, if Continental's extension for ninety days after August 15, 2011 was good, the Continental

Lease might still continue as to the Subject Lands that the Trust was proposing to lease to Hess if "drilling operations" occurred on them prior to the extended expiration of the primary term within the meaning of the Pugh Clause. LoneTree conducted the surface inspection on September 21, 2011, and documented it with photographs. The inspection revealed that no surface activity had yet taken place, although there was information from the North Dakota Industrial Commission that Continental was planning on drilling a well in the SW¼SE¼ of Section 23, which would be known as the Edward 1-23H well, on a 1,280 acre spacing unit compromised of the Subject Lands.[2]

    10.0    Based on the situation then existing, land manager Allen authorized LoneTree to make an offer to the Trust for a lease covering the subject lands with terms that would include a 20% royalty and payment of $1,500 per net mineral acre in bonus, with 20% of the bonus being paid upfront on a 5-day draft and with the remaining 80% of the bonus to paid in a second installment within 30 business days upon approval of title. The Hess land manager testified that the reason why he split the payment of the bonus was because of the uncertainties regarding the Continental Lease.

    11.0    Wehrman communicated Hess's offer to Klint Sickler, who generally found it to be acceptable. Sickler did request, however, that the second bonus installment be due on a fixed date rather than 30 business days after execution of the lease. Consequently, the written package of lease documents forwarded to Marcia Sickler provided that the second installment of 80% of the bonus was to be paid on November 11, 2011, which was approximately 30 business days from when it was anticipated the lease would be signed.

---

[2] The Subject Lands (Sections 14 and 23) are adjacent to each other, with Section 14 lying to the north of Section 23.

12.0     The initial package of lease documents was provided to the Sicklers under cover of a letter to Marcia Sickler dated September 28, 2011. The Sicklers then consulted with their attorney who recommended several changes in the draft lease with no changes to the other documents compromising the transaction. Klint Sickler advised Wehrman of some of the changes in an email on September 29, 2011. Wehrman, in turn, caused a new package of lease documents to be prepared that included the lease revisions suggested by the Sickler's attorney and these were presented to the Sicklers under cover of a new letter to Marcia Sickler dated September 30, 2011, and were executed the same day at a restaurant in Dickinson, North Dakota. Present when the documents were signed were Wehrman, acting on behalf of Hess, and Marcia Sickler, her husband, and her son Klint.

13.0     The final agreement that was reached is comprised of four separate documents: a letter agreement dated September 30, 2011; two Orders for Payment - one for 20% of the bonus and the second for the remaining 80% of the bonus; and the Hess Lease.

        13.1     **Letter Agreement**. The following is the full text of the letter agreement:

September 30, 2011

Marcia R. Sickler
10190 22nd Street SW
Gladstone, ND 58630

RE:     **TOWNSHIP 146 NORTH, RANGE 97 WEST, 5th P.M.**
        **Section 14:  All**
        **Section 23:  All**

        **Containing 1,280.00 acres, more or less, in Dunn County, North Dakota - Net acres:  337.298**

Dear Ms. Sickler,

Enclosed you will find an Oil and Gas Lease and Memorandum of Oil and Gas Lease covering the above captioned lands, two Orders of Payment, and one copy of each (so marked for your records). The Orders of Payment are documents stating that the Marcia R. Sickler Mineral Trust will be paid by check. Also enclosed is a W-9 form.

The first check will be paid **5 days** from the date of this lease. This will allow us time to process the lease and complete the necessary title work prior to paying the Lease bonus. If, after confirmation of title, it is determined that the net acres owned by your Trust and available for leasing is different from **337.298**, then the total bonus to be paid may be adjusted accordingly. Please note that the terms offered are as follows:

- **$1,500.00 per net mineral acre**
- **3 year lease term, paid up**
- **20.00% royalty**
- **The bonus is payable in two installments of 20% (paid 5 days from the date of this lease) and 80% (paid on November 11, 2011)**

Please take some time to review the package. If you have any questions or concerns, please contact me at the number below. To execute this lease package you need to do the following:

1. Sign the original lease and memorandum **in the presence of a notary public.**
2. Fill in the **Tax ID number or Social Security number** for you [sic] Trust on the enclosed **W-9 form**.
3. **Return** the **original Oil and Gas Lease, Memorandum of Oil and Gas Lease, Orders of Payment** and the **completed W-9** to us via the enclosed return envelope.
4. **Counter sign this letter below to acknowledge acceptance of the terms stated above and include in the enclosed return envelope.**

This offer expires 30 days from the above date, and return of the executed oil and gas lease after that date will be considered an offer by you to lease which the Lessee (or Lone Tree) can either accept or reject.

| | |
|---|---|
| Sincerely, | Marcia R. Sickler Mineral Trust |
| [/s] | [/s] |
| Cliff Wehrman | Marcia R. Sickler, Trustee |
| Agent for LoneTree Energy & Associates, LLC | |
| Cell phone # 1-701-570-0006 | |

(emphasis in original).

        13.2   **Orders for Payment**. The two Orders for Payment are virtually identical except for the amounts, the deadlines for payment, and the recitation of the percentage that each Order bore to the entire amount of the bonus payable. The text of the Orders for Payment is set forth below with the bracketed language reflecting the changes from the first to the second Order for Payment:

7

ORDER FOR PAYMENT

On approval of the agreement associated herewith and on approval of title to the same, LoneTree Energy & Associates LLC will make payment as indicated herein by check within 5 days of September 30, 2011 [on November 11, 2011]. Payment is deemed complete upon mailing or dispatch. No default shall be declared for failure to make payment until 10 days after receipt of written notice from payee of intention to declare such default.

If the Oil and Gas Lease referenced herein covers less than the entire undivided interest in the oil and gas or other rights in such land, then the dollar amount listed herein shall be paid to the Lessor only in the proportion which the interest in said lands covered by the Agreement bears to the entire undivided interest therein. Further, should Lessor own more or less than the net interest defined herein, Lessee shall increase or reduce the dollar amount payable hereunder proportionately.

Lessor and Lessee agree that, when Lessor executed the Oil and Gas Lease, Lessor and Lessee entered into a binding contract that, among other things, leases the lands listed in the Oil and Gas Lease and/or Exhibit A to Lessee. Lessee agrees to pay Lessor the bonus consideration for the Lease subject to Lessee verifying Lessor's net mineral acre ownership, as determined solely by Lessee.

PAY TO:    Marcia R. Sickler Mineral Trust

AMOUNT:    * * * *                              $101,189.40 [$404,757.60]

ADDRESS:   10190 22nd Street SW, Gladstone, ND 58630

This payment constitutes 20% [80%] bonus consideration for a 3 year Paid-Up Oil and Gas Lease dated September 30, 2011 covering the following described lands in Dunn County, North Dakota.

> TOWNSHIP 146 NORTH, RANGE 97 WEST, 5th P.M.
> Section 14: All
> Section 23: All
> GROSS ACRES: 1,280.00
> NET ACRES: 337.298

LoneTree Energy & Associates, LLC          Marcia R. Sickler Mineral Trust
    [/s]                                         [/s]
Aaron Michael, as Agent                    Marcia R. Sickler, Trustee

    13.3   **Hess Lease**. The relevant portions of the Hess Lease are as follows:

The "leasing clause" of the Hess Lease states in relevant part that the Sickler Trust:

has granted, demised, leased and let, and by these presents does grant, demise, lease and let **exclusively** unto said Lessee, the land hereinafter described, with the **exclusive right** for the purpose of [developing the Subject Lands including for oil and gas purposes] * * * *

8

(emphasis added). The "leasing clause" then goes on to describe the Subject Lands being leased as all of Sections 14 and 23 of Township 146 North, Range 97 West, "containing 1,280.00 gross acres, more or less."

The "warranty clause," which appears later in the lease, reads as follows:

> 14. Lessor hereby ~~warrants and agrees to defend the title to the lands herein described, and~~ agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment any mortgages, taxes or other liens on the above described lands, in the event of default of payment by Lessor and be subrogated to the rights of the holder thereof, and the undersigned Lessors, for themselves and their heirs, successors and assigns, hereby surrender and release all right of dower and homestead in the premises described herein, insofar as said right of dower and homestead may in any way affect the purpose for which this lease is made, as recited herein.

The striking of the express warranty was one of the changes recommended by the Sicklers' attorney and was accepted by Hess.

14.0 Leading up to the consummation of the agreement between Hess and the Trust, there is no evidence of any explicit discussion about Hess having the right to not make the second bonus payment if it appeared that the Continental Lease would continue to be in force. However, Cliff Wehrman testified that, in his discussions with Klint Sickler, he communicated Hess's concern that the Continental Lease could continue and that was the reason Hess would only pay 20% of the bonus upfront with the rest to be paid later. The court finds this testimony to be credible.

15.0 Under cover of a letter dated October 5, 2011, LoneTree forwarded a check to Marcia Sickler as the trustee of the Sickler Trust in the amount of $101,189.40 in satisfaction of the first 20% of the bonus. On October 11, 2011, Marcia Sickler acknowledged that the Trust had received the check, which was subsequently cashed.

16.0 On October 11, 2011, Diamond Resources Co., on behalf of Continental, recorded in Dunn County a "Notice of Continuing Validity of Oil and Gas Lease" stating that the Continental

9

Lease remained in effect because: (1) the July 16, 2011, lease expiration date was extended to August 15, 2011, under the continuous drilling clause; (2) Marcia Sickler executed the 90-day lease extension effective August 15, 2011; and (3) Continental had tendered timely payment for the lease extension.

17.0  On October 31, 2011, and prior to the date for having to make the second bonus payment, LoneTree conducted a second surface inspection of the Subject Lands at Hess's request and discovered that Continental had staked the location for the drilling of the Edward 1-23H well. In fact, the staking crew was on site when the inspection was made. The stake for the well location and the presence of the staking crew were documented by photographs.

18.0   The Sicklers were cognizant of the significance of Continental engaging in drilling operations on the Subject Lands prior to the extended expiration of the lease term. In particular, Klint Sickler acknowledged during his testimony that he had at one point discussed with Wehrman the fact it might be difficult for Continental to begin drilling activity in time because they were in a dispute with the surface owner over the location for the proposed well. Further, on November 7, 2011, Sickler emailed Wehrman stating:

> Hi Cliff,
> Just wanted to touch base with you before you leave the country. Have you guys seen or heard anything in regards to CLR activity on our lease site? Looking at the NDIC site, it appears that CLR has a rig on the Thorvald site that would relatively close by, but the spud date was 10/6 . . . . so hopefully it takes just long enough that they run out of time. Anyways, just wanted to see if you knew anything.
> Thanks!
>
> Klint Sickler

The court interprets this email to mean that Klint Sickler was concerned that Continental had a drilling rig that was working at a nearby well site but he was hopeful the rig would not finish drilling at that site in time to be moved and commence drilling operations on the Subject Lands.

10

19.0 Based on Continental's real estate filing claiming continued validity of the oil and gas lease and the physical activity occurring on the Subject Lands, land manager Allen directed that the second bonus payment not be made because it appeared the Continental Lease would continue beyond the primary term as extended with respect to the Subject Lands. Allen further directed that a third confirmatory site inspection be made, which was performed on November 14, 2011. This inspection, which was again documented with photographs, showed that Continental had by that date constructed a well pad and a rat hole for the Edward 1-23H Well. It also appears from the photographs that Continental had constructed (or at least improved) an access road to the well site. On the same day, LoneTree sent a letter to Marcia Sickler noting the filing of the Notice of Continuing Validity of the Continental Lease and stating that, as of November 14, 2011, Continental had constructed a pad for the drilling of the Edward 1-23H Well in the SW¼SE¼ of Section 23 of the Subject Lands. The letter went on to state that it was being sent "to follow up previous verbal confirmation that Hess Corporation will need to hold the remaining balance of the lease payment until the title issue with Continental is resolved."

20.0 On March 9, 2012, Continental filed an affidavit of production stating that the Edward 1-23H Well had been completed on or about February 9, 2012, for a valid spacing unit comprising Sections 14 and 23 of Township 146, Range 97 (*i.e.*, the Subject Lands) and that the well was producing. The affidavit went on to list the leases Continental claimed were being held by this production, which included the Continental Lease. This information is consistent with a North Dakota Industrial Commission Well Ticket, which further indicated that drilling had commenced on the Edward 1-23H Well ("the spud date") on November 29, 2011, and that the well was completed on February 8, 2012.

21.0 The Sickler Trust has not taken any action against Continental challenging the continuing validity of the Continental Lease as to the Subject Lands. In fact, the Trust has accepted royalty payments on production from the Edward 1-23H Well.

22.0 The mutual intent of the parties was that Hess could disapprove title and not make the second bonus payment if the Continental Lease would continue in force. The reasons for this finding are discussed in more detail below.

23.0 Hess's decision not to pay the second installment of bonus was based upon a legitimate title concern, *i.e.*, the likelihood it would not be acquiring the exclusive right to drill for oil and gas on the Subject Lands because of the probable continuation of the Continental Lease that was superior in time.

### III. CONCLUSIONS OF LAW

1.0 Under North Dakota law, the primary goal of contract construction is to give effect to the *mutual* intentions of the parties at the time the contract was made. E.g., Bendish v. Castillo, 2012 ND 30, ¶ 16, 812 N.W.2d 398 ("Bendish"). "The intention of the parties to a contract must be gathered from the entire instrument, not from isolated clauses, and every clause, sentence, and provision should be given effect consistent with the main purpose of the contract." National Bank of Harvey v. International Harvester Co., 421 N.W.2d 799, 802 (N.D. 1988); see N.D.C.C. § 9-07-06. Also, in construing the agreement, the court can consider its object and the circumstances under which the contract was made. E.g., Bendish, 2012 ND 30 at ¶ 16; N.D.C.C. § 9-07-12.

When rational arguments can be made for different interpretations of the contract language, the contract is ambiguous. Id..; Golden v. SM Energy Co., 2013 ND 17, ¶ 13, 826 N.W.2d 610 (district court erred in granting summary judgment when rational arguments existed for differing

interpretations). The consequence of a determination of ambiguity (which is a question of law) is the following:

> "A determination of ambiguity is but the starting point in the search for the parties' ambiguously expressed intentions," since an ambiguity creates "questions of fact to be determined with the aid of extrinsic evidence." Bohn v. Johnson, 371 N.W.2d 781, 788 (N.D. 1985). When the terms of a contract are ambiguous, "extrinsic evidence of the parties' intent may be considered and the terms of the contract and the parties' intent become questions of fact." Wachter Development, L.L.C. v. Gomke, 544 N.W.2d 127, 131 (N.D. 1996). As National Bank of Harvey, 421 N.W.2d at 803, explained, the resolution of an ambiguity with extrinsic evidence requires the trier of fact to make a finding of fact.

Bendish, 2012 ND 30 at ¶ 16 (quoting Moen v. Meidinger, 547 N.W.2d 544, 546–47 (N.D. 1996)).

2.0     In this case, the court concluded in its earlier order denying defendants' motion for summary judgment that the agreement of the parties was ambiguous in terms of what the overall deal was with respect to the payment of the bonus. That is, when the agreement was made, did Hess commit itself to the payment of the bonus regardless of the continued validity of the Continental Lease, as the Sickler Trust contends? In other words, did Hess agree to pay over $500,000 in combined bonus amounts for the opportunity that the Continental Lease might not continue and that its lease would then be in first position? Or, did Hess reserve the right to not pay the second bonus amount if it appeared at that time the Continental Lease would continue in effect, as Hess contends? The reasons why the particular language used in the several instruments constituting the parties' agreement plausibly supports the position of both parties, thereby rendering the agreement ambiguous, are spelled out in detail in the court's prior order denying defendants' motion for summary judgment and need not be repeated here. Marcia R. Sickler Mineral Trust, 2013 WL 4508429, at **3-10.

3.0     During the trial, both parties offered testimony as to what they thought the deal was and what they perceived the language of the agreement to mean.  To the extent this amounted to little more than after-the-fact, self-serving testimony as to what each party believed the agreement meant, the court gave it little weight with respect to the ultimate issue.  Rather, in considering the extrinsic evidence presented at trial, the court focused upon what was communicated between the parties during the discussions leading up to the consummation of the agreement as well as the parties' subsequent conduct.  <u>See</u>, <u>e.g.</u>, <u>Holman v. State</u>, 438 N.W.2d 534, 538 (N.D. 1989) ("Also, if it is difficult to ascertain the parties' intention from the writing alone, the court may look at the subsequent conduct of the parties to help determine the intention of the parties and the construction the parties put upon the agreement."); <u>National Bank of Harvey</u>, 421 N.W.2d at 804 ("It is the outward manifestations of assent which govern, not the secret intentions of the parties.")

As indicated in the foregoing findings of fact, the court concludes the intent of the parties was that Hess would have the right to not make the second bonus payment if it was dissatisfied with the Trust's title in terms of whether it would be acquiring the right to explore and drill for oil and gas to the exclusion of Continental and its rights under the Continental Lease.  In reaching this conclusion, the court relies on those parts of the agreement that favor Hess's interpretation as discussed in the court's earlier order and the circumstances under which the agreement was made. This includes: (1) the language in the second Order for Payment referencing "on approval of title;" (2) the language in the Hess Lease in which the Trust agreed to give Hess the "exclusive right" to drill for and develop oil and gas without any qualification that this promise was subject to the Continental Lease; and (3) the fact that the bonus was made payable in two parts with the largest

14

amount deferred to the second payment rather than all at once. In addition, after weighing the relevant extrinsic evidence, the court has relied in particular upon the following:

- Hess had legitimate concerns regarding the status of the Continental Lease all the way up to the time for payment of the second installment of bonus. The Trust had signed an extension of the Continental Lease extending the primary term by ninety days, which was very close (within a day or two) to the date for the second bonus payment. While the Trust had taken the position the extension was not valid because payment for its consideration had purportedly not been made in time, Continental disputed that in the filing it made on October 11, 2011. Also, even if the payment was late, that would not automatically terminate the lease; rather, a fact question would exist as to whether the failure to make timely payment amounted to failure of consideration. See Irish Oil and Gas, Inc. v. Riemer, 2011 ND 22, ¶¶ 23-25, 794 N.W.2d 715. Then, if the Continental Lease had not terminated, Continental's lease rights would continue with respect to the Subject Property if Continental commenced "drilling operations" on the Subject Lands prior to the expiration of the primary term as extended within the meaning of the Pugh Clause. Further, while the North Dakota Supreme Court has not yet decided the issue, this court and the Eighth Circuit in several decisions have concluded that "drilling operations" does not require actual drilling and can be satisfied by sufficient preparatory activity prior to the expiration of the lease term if it is followed by continuous operations resulting in timely completion of the well. E.g., Wold v. Zavanna, LLC, No. 4:12–cv–00043, 2013 WL 6858827, at **2-8 (D.N.D. Dec. 31, 2013); Anderson v. Hess Corp., 733 F. Supp. 2d

1100 (D.N.D. 2010), aff'd, 649 F.3d 891 (8th Cir. 2011). In summary, the very real possibility that the Continental Lease was going to be extended beyond its primary term was a cloud upon the title and a title defect within the meaning of the "title approval" proviso in the Second Order for Payment.[3] See Empire Gas & Fuel Co. v. Stern, 15 F.2d 323, 326-27 (8th Cir. 1926) (existence of prior unreleased oil and gas lease was sufficient cloud to justify non-approval of title even if there was questions regarding its validity).

- The testimony of Cliff Wehrman (which the court found credible) that he advised Klint Sickler (who was doing the negotiating on the behalf of the Trust) that the reason for splitting the bonus into two payments was that Hess remained concerned about the Continental Lease.

- The testimony of Klint Sickler that, when asked about his understanding of the word "exclusively" in the Hess Lease, he responded with words to the effect that it meant Hess would be the only ones holding the rights to develop the Subject Property.

- Klint Sickler's understanding that, if Continental drilled a well on the Subject Lands prior to the expiration of the primary term of the lease as extended, this might continue the Continental Lease as evidenced by his discussion with Cliff Wehrman about whether Continental would be able to drill in time because of problems with the surface owner as well as the email discussed next.

---

[3] Whether Hess had the unfettered discretion to disapprove the title need not be decided here since there was a legitimate title issue. In fact, the Trust would be hard pressed to argue to the contrary since it subsequently accepted royalty payments on the production from the Edward 1-23H Well. Cf., West v. Alpar Resources, Inc., 298 N.W.2d 484, 492 (N.D. 1980) (holding that the acceptance of royalty payments was inconsistent with plaintiffs' intent to cancel the lease in that case).

- Klint Sickler's email to Cliff Wehrman of November 7, 2011, (which was approximately four days prior to the deadline for Hess making the second bonus payment) expressing concern about whether Continental would be able to commence drilling in time. While it may be that Sickler's interest was simply that the Trust preferred dealing with Hess as an operator, the court concludes that it is more likely his concern sprung from his understanding that Hess had the right not to make the second bonus payment if the Continental Lease continued in force and that, if this happened, the Trust would lose the benefit of the bonus and the more generous terms of the Hess Lease.

- Hess procuring a site inspection prior to the payment of the first bonus, a second site inspection just prior to deciding not pay the second bonus, and a confirmatory third site inspection. This conduct was consistent with an understanding that it had the right to disapprove title and not pay the second bonus payment if it appeared the Continental Lease would continue as to the Subject Lands.[4]

4.0    While the foregoing disposes of the case, the court will touch upon several of the arguments made by the Trust:

    4.1    The Trust argues that "title" for purposes of the "on approval of title" language of the Orders for Payment was defined by the agreement to simply mean whether or not the Trust possessed the net mineral acre ownership set forth in the agreement. However, as explained in the court's prior order, the language relied upon by the Trust is subject to differing

---

[4] Because the court was able to construe the agreement based on the foregoing, the court did not have to resort to the rule of construction that provides for construing the ambiguous language against the drafter, which, under North Dakota law, is only to be used when the ambiguity cannot be resolved using extrinsic evidence and applying the other rules of construction. E.g., Kaler v. Kraemer, 1999 ND 237, ¶ 19, 603 N.W.2d 698; N.D.C.C. § 9-07-19.

interpretations and the court has concluded here that the intent of the parties was that the "title approval" proviso in the second Order for Payment would not be so limited. Also, the court concludes that the parties intended that "Lessor's net mineral acre ownership" to include not only the right to lease and reserve a royalty, but also the full "working interest" consistent with the promise in the lease that Hess would have the exclusive right to develop the Subject Lands. See Marcia R. Sickler Mineral Trust, 2013 WL 4508429, at *9.

        4.2      The Trust also argues that the striking of the express warranty makes clear that Hess agreed to assume the risk that the Continental Lease might continue. However, as explained in the court's prior order, the mere agreement to strike the express warranty does not mean that Hess necessarily agreed to assume the risk with respect to the Continental Lease. This is because there is a difference between having a warranty (either express or implied) upon which a person can sue if title turns out to be defective and having a contractual "out" to not make a payment if the title is not satisfactory. Id. at *7; cf. Smith v. Arrington Oil & Gas, Inc., 664 F.3d 1208, 1216 (8th Cir. 2012) ("title approval" proviso in sight draft was a condition precedent); Broughton Associates Joint Venture v. Boudreaux, 70 S.W.3d 324, 328 (Tex. Ct. App. 2002) (same).

        4.3      Finally, the Trust argues that Hess's recording of a memorandum of its lease constituted full acceptance of title. The court disagrees. The agreement does state that this would be the effect of the recording, and, absent something more, the court will not imply either waiver or acceptance from the mere act of recording since the usual reason for recording is to put third parties on notice of the rights being acquired. See, e.g., Pine Petroleum, Inc. v. Ekern, No. 4:12-cv-079, 2014 WL 345289, at *6 (D.N.D. Jan. 30, 2014); Martin v. Turner Oil & Gas Properties, Inc., No. 1:11-cv-102, 2013 WL 1183786, at * * 3-4 (D.N.D. Mar. 21, 2013).

**IV.     ORDER FOR JUDGMENT**

Based on the foregoing, judgment shall be entered in favor of defendants **DISMISSING WITH PREJUDICE** plaintiff's complaint. Given the closeness of the issues, the court in its discretion will not award costs to either party.

**IT IS SO ORDERED**.

Dated this 2nd day of April, 2014.

> */s/  Charles S. Miller, Jr.*
> Charles S. Miller, Jr., Magistrate Judge
> United States District Court